# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs July 18, 2012

## STATE OF TENNESSEE v. JASON LEE BILES

**Appeal from the Circuit Court for Warren County**
**No. F12833      Larry B. Stanley, Judge**

---

**No. M2011-02090-CCA-R3-CD - Filed December 12, 2012**

---

The Defendant, Jason Lee Biles, appeals as of right from his jury conviction for delivery of a Schedule II controlled substance, a Class C felony, and the trial court's subsequent sentence of ten years. The Defendant contends that the evidence submitted to the jury was insufficient to support his conviction and that the trial court's ten-year sentence was excessive and inconsistent with the Sentencing Act. After reviewing the record and relevant authorities, we conclude that the evidence is sufficient to support the Defendant's conviction and that the trial court's ten-year sentence is neither excessive nor inconsistent with the Sentencing Act. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and NORMA MCGEE OGLE, J., joined.

Dan T. Bryant, District Public Defender; and Trenena G. Wilcher, Assistant Public Defender, McMinnville, Tennessee, for the appellant, Jason Lee Biles.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel Harmon, Assistant Attorney General; Lisa A. Zavogiannis, District Attorney General; and Joshua T. Crain, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL BACKGROUND

This case arises from a controlled drug transaction on July 19, 2010, that took place in the parking lot of Stewart's Pharmacy in Warren County, Tennessee. As a result of this exchange, a Warren County grand jury indicted the Defendant for delivery of less than .5

grams of cocaine, a Class C felony, and delivery of .5 grams or more of cocaine within a school zone, a Class B felony. The school zone charge was severed from the instant case.

The trial was held on May 19, 2011. At the trial, Chief Investigator Mark Martin testified that he had been working for the Warren County Sheriff's Department for fourteen years and that he worked in the narcotics division. Chief Martin explained that during his narcotics investigation he sought out the confidential informant, Lamar Martin, to assist him in making a controlled buy from the Defendant. Chief Martin testified that Mr. Martin had previously been indicted for the sale of prescription drugs and had stated that he did not want to go to jail, so Chief Martin asked him to assist law enforcement in setting up a controlled buy with the Defendant. Chief Martin explained that Mr. Martin agreed to assist them with the controlled buy and that he explained the rules of being a criminal informant to Mr. Martin. Chief Martin testified that Mr. Martin was "wired" with a listening device, monitored by him and Investigator Jody Cavanaugh, when Mr. Martin called the Defendant to set up the controlled buy. After the Defendant and Mr. Martin agreed on a location where the buy was to take place,[1] Mr. Martin, Mr. Martin's wife, and his car were searched, and Mr. Martin was given fifty dollars for the controlled drug transaction.

During Mr. Martin's conversation with the Defendant, he requested that Mr. Martin bring him some cigarettes when they met to exchange the drugs. So, in route to the controlled drug buy, Mr. Martin stopped at a BP gas station to purchase the cigarettes the Defendant had requested. Chief Martin testified that he and Inv. Cavanaugh continued to follow Mr. Martin, monitoring him the entire time. Mr. Martin and the Defendant finally met in the parking lot at Stewart's Pharmacy and Mr. Martin exchanged the money for the drugs. This transaction took approximately one minute. Chief Martin testified that he and Inv. Cavanaugh left the parking lot first, before Mr. Martin returned to his car, and they returned to the predetermined place where they would meet Mr. Martin to retrieve the drugs he had purchased from the Defendant. Upon his arrival, Mr. Martin presented a rock of cocaine. Chief Martin testified that he and Inv. Cavanaugh searched Mr. Martin's car again upon his return.

On cross-examination, Chief Martin acknowledged that he could not remember who searched Mr. Martin's car prior to the controlled drug buy nor could he remember how long it took to conduct the search. He admitted that Mr. Martin's wife was also present during the controlled buy and that she was searched. Chief Martin also admitted that he and Inv. Cavanaugh left the Stewart's Pharmacy parking lot before Mr. Martin but that they only left the scene after Mr. Martin began walking away from the Defendant's car.

---

[1] Initially, Mr. Martin and the Defendant had agreed to meet at the Starlight Apartments, but the Defendant called Mr. Martin and changed the location to Stewart's Pharmacy shortly after their initial conversation.

Investigator Cavanaugh testified that he had been in law enforcement twenty-six years and currently worked as an investigator in the Narcotics Division. Inv. Cavanaugh explained that he was present with Chief Martin when he met with the confidential informant, Mr. Martin, to search his car and otherwise prepare him for his controlled drug purchase from the Defendant. He testified that he "wired up" Mr. Martin before the controlled buy that day and was present during Mr. Martin's telephone call to the Defendant. Inv. Cavanaugh explained that, based on his experience as a narcotics officer, he understood that the two men were meeting because "Mr. Martin was going to purchase a half of a gram of crack cocaine from [the Defendant]." He testified that he and Chief Martin then followed Mr. Martin to meet the Defendant and monitored the transaction via the wire that Mr. Martin was wearing. Inv. Cavanaugh further testified that he observed the Defendant standing beside Mr. Martin's car and that he heard the Defendant making the sale on the audio recording. After the sale was complete, he and Chief Martin returned to the "meeting place" to wait for Mr. Martin. Upon his arrival, they retrieved the "white rock" from Mr. Martin and placed it in an envelope for submission to the Tennessee Bureau of Investigations (TBI).

On cross-examination, Inv. Cavanaugh acknowledged that he searched Mr. Martin's wife prior to the controlled buy because, although there were female officers, they did not have any female narcotics officers. He also admitted that no one searched Mr. Martin again after the stop at the BP gas station where Mr. Martin purchased the cigarettes that the Defendant had requested but stated that he observed Mr. Martin exit and return to the car. Inv. Cavanaugh acknowledged that he did not actually see the Defendant "hand Mr. Martin any cocaine." Inv. Cavanaugh stated that Mr. Martin was given fifty dollars to make the controlled buy. He explained that he wrote Mr. Martin's statement after the controlled drug buy and that he simply made a clerical error in noting that Mr. Martin was given forty dollars to make the controlled buy instead of fifty.

Agent Mark Young, a forensic science expert employed with TBI, testified that the substance sent to the TBI for analysis regarding this case was a hard, rock-like substance that was determined to contain 0.3 grams of cocaine base. He also testified as to the chain of custody involving this evidence from the time it was sent to TBI until the day of trial.

Mr. Martin testified that he and the Defendant were once next door neighbors and that he had known the Defendant since he was about twelve or thirteen years old. He explained that he was a convicted felon and that he agreed to purchase drugs from the Defendant to avoid receiving jail time after he was arrested for selling prescription drugs. Mr. Martin testified that Chief Martin approached him about working as a confidential informant and that they later had a conversation with the prosecutor in which the prosecutor agreed to dismiss his charge in exchange for him giving them "specific names of people that [he] knew were involved in the cocaine trade." One of the names that Mr. Martin provided was that of

the Defendant; he also gave law enforcement the Defendant's phone number. Mr. Martin testified that on July 19, 2010, he made a telephone call to the Defendant and that it was monitored by both Chief Martin and Inv. Cavanaugh. The telephone call was then played for the jury, and Mr. Martin explained to them his somewhat coded conversation with the Defendant. Mr. Martin testified that their conversation concluded with him agreeing to meet the Defendant at the Skyline apartments to purchase cocaine. He testified that Inv. Cavanaugh searched him "thoroughly" before he went to meet the Defendant and that he understood that they searched him to "make sure [he] didn't have nothing on [him]." Mr. Martin then got into his car and headed towards the Skyline apartments with Chief Martin and Inv. Cavanaugh trailing him approximately three to four cars back the entire time. During his drive to Skyline Apartments, the Defendant called and asked Mr. Martin to meet him at a different location, Stewart's Pharmacy. Mr. Martin agreed and informed law enforcement of the change in location. Mr. Martin stated that in route to Stewart's Pharmacy, he stopped to get the cigarettes that he had agreed to bring for the Defendant; he insisted that no one gave him any cocaine nor did he otherwise retrieve any cocaine during this stop.

The jury found the Defendant guilty of delivery of less than .5 grams of cocaine.

The sentencing hearing was held on July 13, 2011. At the hearing, the State presented the testimony of Sally Cantrell, an employee with the Board of Probation and Parole, who prepared the pre-sentence report in this case. She testified that in her report, she noted the following statement made by the Defendant: "Informant, phoned to purchase cocaine. I met with informant and sold cocaine to informant." Ms. Cantrell also testified as to the Defendant's prior, drug-related convictions and stated that the Defendant was on parole for a conviction involving a Schedule II drug when he committed the offense in the instant case. On cross-examination, Ms. Cantrell admitted that nothing in the presentence report indicated that the Defendant was a violent offender or a danger to society other than to the extent that selling drugs was considered a danger to society.

The State asked that the trial court apply the following enhancement factors: (1) that the Defendant had a prior history of criminal convictions in addition to those necessary to establish him as a Range II offender; (8) that the Defendant before trial or sentencing had failed to comply with the conditions of a sentence involving release into the community; and (13) that at the time the felony was committed, the Defendant was released on parole. See Tenn. Code Ann. § 40-35-114(1), (8), (13). The Defendant, through counsel, pleaded for leniency; however, the Defendant did not speak on his own behalf.

After hearing the arguments of counsel, the trial court found that the enhancement factors requested by the State were applicable. The trial court noted that the Defendant had

requested that it consider the mitigating factor that the criminal conduct neither caused nor threatened serious bodily injury. However, the trial court noted that these drugs were "controlled for a reason" and that it was not certain if it "would give a lot of credence to the fact that it would not threaten serious bodily injury anyway to ingest cocaine." The trial court also noted that the Defendant's prior record and "the seven different times he has either violated probation or parole" evince "his unwillingness to comply [or cooperate] with law enforcement." Finding that the Defendant's criminal history "extremely outweigh[ed] all the other possible mitigating factors and enhancing factors involved" in the case, the trial court sentenced the Defendant to serve ten years. The trial court denied probation, stating that it believed the Defendant was "a danger to society, ha[d] shown no ability to be able to stop passing dangerous controlled substances to other persons for profit" and concluding that it had "no reason to believe that he c[ould] be rehabilitated at this time." Finally, the trial court stated that incarceration was appropriate to serve as a deterrent effect to others in the community who engage in the same behavior and denied any form of split confinement.

The Defendant perfected a timely appeal.

ANALYSIS

The Defendant contends that the State presented evidence that was "rife with inconsistencies" and that the evidence is insufficient to sustain his conviction. The Defendant also challenges his ten-year sentence imposed by the trial court, alleging that it is excessive and inconsistent with the Sentencing Act.

*I. Sufficiency of the Evidence*

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a

presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of proof is the same, whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

The Defendant was convicted of the delivery of a Schedule II Controlled Substance pursuant to Tennessee Code Annotated section 39-17-417. That statute provides, in relevant part, that it is an offense for a defendant to knowingly . . . deliver a controlled substance. See Tenn. Code Ann. § 39-17-417(a)(2). "[A] person . . . acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." Tenn. Code Ann. § 39-11-302(b). The terms "deliver" and "delivery" are statutorily defined as "the actual, constructive, or attempted transfer from one person to another of a controlled substance, whether or not there is an agency relationship." Tenn. Code Ann. § 39-17-402(6). Thus, to support the conviction for delivery of a controlled substance, the State must prove that the Defendant was "aware" that he was transferring the controlled substance, cocaine, to another person and that the substance was, in fact, cocaine.

The evidence presented at trial, viewed in a light most favorable to the State, showed that on July 19, 2010, Mr. Martin, the confidential informant, bought cocaine from the Defendant. During a recorded phone conversation with the Defendant, Mr. Martin told the Defendant that he wanted to buy cocaine, and the Defendant agreed to sell him ".5 [grams of] crack cocaine." Inv. Cavanaugh and Chief Martin searched Mr. Martin, his car, and his wife before they left to meet the Defendant and again after they returned. Mr. Martin proceeded to the location where he and the Defendant agreed that the exchange would take place; the officers constantly followed Mr. Martin during the controlled buy. Mr. Martin was wearing a wire, and the entire controlled buy was recorded. The Defendant met Mr. Martin in the Stewart's Pharmacy parking lot, where Mr. Martin gave the Defendant fifty dollars in exchange for cocaine, per their prior agreement. Agent Young confirmed that the substance Mr. Martin purchased was, in fact, .3 grams of cocaine.

Although the Defendant argues that the State's evidence was "rife with

inconsistencies," there was sufficient evidence presented at trial for a rational jury to conclude that the Defendant delivered less than .5 grams of cocaine to Mr. Martin. The jury's verdict indicates that it accredited the testimony of Mr. Martin and resolved all factual inconsistencies in favor of the State. As such, the Defendant is not entitled to relief on this issue.

## II. Sentencing

The Defendant contends that his sentence of ten years is excessive and contrary to the purposes and principles of the Sentencing Act, specifically noting that the enhancement factors used by the trial court were insufficient to justify the imposition of a sentence "at the top of the range." The State responds that the trial court was "impressed" by the Defendant's lengthy criminal history and that the Defendant committed the instant offense while on parole. The State further responds that the trial court followed the purposes and principles of sentencing when it imposed the ten-year sentence and that the Defendant is not entitled to relief.

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b). To facilitate appellate review, "it is critical that trial courts adhere to the statutory requirement set forth in Tennessee Code Annotated section 40-35-210(e)" and articulate in the record its reasons for imposing the specific sentence. See State v. Susan Renee Bise, -- S.W.3d --, No. E2011-00005-SC-R11-CD, 2012 WL 4380564, at *20 n.41 (Tenn. Sept 26, 2012).

The 2005 amendments to the Sentencing Act "served to increase the discretionary authority of trial courts in sentencing." Id. at *18. Currently, upon a challenge to the sentence imposed, it is the duty of this court to analyze the issues under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at *17. Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," Tennessee Code Annotated section 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," Tennessee Code Annotated section 40-35-102(3), and consideration of

a defendant's "potential or lack of potential for . . . rehabilitation," Tennessee Code Annotated section 40-35-103(5). State v. Carter, 254 S.W.3d 335, 344 (Tenn. 2007). The burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001).

Our amended Sentencing Act no longer imposes a presumptive sentence. Carter, 254 S.W.3d at 343. Tennessee Code Annotated section 40-35-210 was amended to provide as follows:

> (c) The court shall impose a sentence within the range of punishment, determined by whether the defendant is a mitigated, standard, persistent, career, or repeat violent offender. In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:
>
> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
>
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.
>
> (d) The sentence length within the range should be consistent with the purposes and principles of this chapter.

Tenn. Code Ann. § 40-35-210(c), (d).

"[T]he 2005 amendments rendered advisory the manner in which the trial court selects a sentence within the appropriate range, allowing the trial court to be guided by—but not bound by—any applicable enhancement factors when adjusting the length of a sentence." Bise, 2012 WL 4380564, at *17. In accordance with the broad discretion now afforded our trial court's sentencing decisions,

> misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005. So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a

sentence imposed by the trial court within the appropriate range should be upheld.

Id.

In the instant case, the trial court found that three enhancement factors applied: (1) that the Defendant had a prior history of criminal convictions in addition to those necessary to establish him as a Range II offender; (8) that the Defendant before trial or sentencing had failed to comply with the conditions of a sentence involving release into the community; and (13) that at the time the felony was committed, the Defendant was released on parole. The Defendant does not contest their applicability. Additionally, as the authority above indicates, the trial court is granted a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act. Classified as a Range II offender, the Defendant's range of punishment was between six and ten years. Despite his plea for leniency, the trial court sentenced him to the maximum, noting that the Defendant's criminal history carried the most weight in its determination. The trial court imposed a within-range sentence, albeit the maximum, and the record both supports the trial court's determination and evinces that the trial court considered and properly applied the principles and purposes of the Sentencing Act. Therefore, the Defendant is not entitled to relief on this issue.

## CONCLUSION

Accordingly, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE